**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**ELIZABETH MILLER**                                                                          **PLAINTIFF**

**v.**                                        **Case No. 4:24-cv-00335-KGB**

**DEPARTMENT OF HUMAN SERVICES**                                        **DEFENDANT**

**OPINION AND ORDER**

Plaintiff Elizabeth Miller sues defendant Arkansas Department of Human Services ("DHS"), asserting employment discrimination claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"); 42 U.S.C. § 1981; 42 U.S.C. § 1983; and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 (Dkt. No. 1). Before the Court is DHS's motion for summary judgment (Dkt. No. 16). Miller responded in opposition to the motion for summary judgment (Dkt. No. 23). For the following reasons, the Court grants DHS's motion for summary judgment (Dkt. No. 16).

## I.      Factual Background

The following factual statements are taken from DHS's statement of undisputed material fact (Dkt. No. 18). [1]

---

[1] Local Rule 56.1(b) of the *Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas* requires that Miller file a "separate, short and concise statement of the material facts as to which [she] contends a genuine dispute exists to be tried." Pursuant to Local Rule 56.1(c), "[a]ll material facts set forth in the statement filed by the moving party. . . shall be deemed admitted unless controverted by the statement filed by the non-moving party. . . ."

Further, Miller must support her denials with relevant, admissible evidence in the record before the Court as required by Federal Rule of Civil Procedure 56(c). *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion"). If Miller relies on documents that have been previously filed in the record, she must specifically refer to those documents by docket number and page. *See Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1113–14 (8th Cir. 2004) (affirming the grant of summary

Miller is a former employee of DHS and was employed by DHS for approximately 40 years from 1983 to 2023 (*Id.*, ¶ 1). Starting in 2015, Miller was employed as an assistant personnel manager in the Office of Human Resources ("HR") (*Id.*, ¶ 2). Miller was terminated from her employment with DHS on May 26, 2023, after she violated DHS Policy 1084 on honesty and integrity (*Id.*, ¶ 3). Miller's termination did not in any way relate to the disciplinary she received in June 2020 (*Id.*, ¶ 4).

Whitney Haynie became Miller's supervisor in or around July 2020 after Miller had been issued a disciplinary from her previous supervisor, Donna Little, in June 2020 (*Id.*, ¶ 5). When Haynie became Miller's supervisor, she met with Damian Hicks, the Chief of HR at DHS, to discuss the employees she would be supervising (*Id.*). During that meeting, Hicks informed Haynie that Miller had received a disciplinary in or around June 2020 from her previous supervisor for passing off work to employees in other divisions (*Id.*). Haynie was not involved in issuing Miller's June 2020 disciplinary (*Id.*, ¶ 6). For reasons unknown to Haynie, however, the June 2020 disciplinary was not placed in Miller's personnel file at the time of its issuance (*Id.*, ¶ 6).

---

judgment because a plaintiff failed to refer properly to specific pages of the record that supported his position).

Here, Miller did not respond to DHS's statements of undisputed fact by admitting or denying each fact alleged by DHS. Miller also did not file a statement of material facts to which she contends there is a genuine dispute to be tried. Instead, Miller filed a statement of undisputed facts in support of her response to DHS's motion for summary judgment (Dkt. No. 23-2). Miller's statement of undisputed fact indirectly denies that there was an "improper disclosure" but otherwise does not directly address or deny DHS's statement of undisputed fact (*Compare* Dkt. No. 18, ¶¶ 19, 21, 24, 27, 28 *with* 23-2, ¶ 8).

Any fact asserted by DHS not denied by Miller is deemed admitted by the Court pursuant to Local Rule 56.1 and Federal Rule of Civil Procedure 56. While noncompliant with Local Rule 56.1, the Court will consider the statements made by Miller in her statement of material undisputed facts in ruling on the pending motion (Dkt. No. 23-2).

After learning that the June 2020 disciplinary was not in Miller's personnel file, Haynie went to Hicks, informed him that it was not in Miller's file, and asked if he had a copy (*Id.*, ¶ 7). Hicks then produced a copy of the disciplinary for Haynie to place in Miller's personnel file (*Id.*). When Haynie discovered the June 2020 disciplinary was not in Miller's personnel file in May 2023, Haynie took affirmative steps to place the disciplinary in Miller's file directly (*Id.*, ¶ 8). In May 2023, multiple HR employees had access to the email inbox where employee disciplinaries were sent, so Haynie hand-carried the June 2020 disciplinary to the personnel file management division within HR (*Id.*).

Haynie approached Tonya Watson, an HR employee responsible for processing personnel actions and placing items in employees' personnel files, and asked Watson to add the June 2020 disciplinary to Miller's personnel file, including her initials and the date it was placed in Miller's personnel file (*Id.*, ¶ 9). Watson previously worked under Haynie's supervision, and Haynie trusted Watson's ability to protect employee confidentiality and her discretion in handling the direct placement of documents in personnel files, as it was a task Watson previously handled for Haynie (*Id.*, ¶ 10). On or around May 3, 2023, Watson and Hicks were the only two employees Haynie directly informed that Miller's June 2020 disciplinary was missing from her personnel file and that Haynie was adding it to Miller's file (*Id.*, ¶ 11).

Haynie then met with Miller to discuss the June 2020 disciplinary, the new concerns as of May 2023 about passing off work to Division of Provider Services and Quality Assurance ("DPSQA") employees, and her functional job duties (*Id.*, ¶ 13). Miller signed the description of her functional job duties and seemed to understand that she could not pass off work to other employees (*Id.*) Haynie did not issue Miller a disciplinary in May 2023 for passing off work (*Id.*).

3

Haynie considered her conversation with Miller to be a productive informal verbal counseling session resolving the issue (*Id.*).

Haynie and Miller had a good working relationship (*Id.*, ¶ 14). After Haynie hand-carried the June 2020 disciplinary to Watson to be placed in Miller's file, Watson and Miller had a phone conversation in which Watson divulged to Miller that Haynie brought the disciplinary over to Watson (*Id.*, ¶ 15).[2] After Miller's phone call with Watson in which Watson divulged personnel information, Miller mentioned the phone call to the DPSQA Deputy Director, Sarah Schmidt (*Id.*).

On or around May 11, 2023, Miller and Schmidt had a conversation in which Miller told Schmidt that somebody in HR called her and told her that Haynie hand-carried a previous disciplinary to HR to be placed in Miller's personnel file (*Id.*, ¶ 16). In her deposition, Miller testified that she said to Schmidt, "Do you know anything about—I heard something about Whitney had walked one of my write-ups that Jerry did?" *Id.* (quoting Dkt. No. 16-1, 63:7–17). When Miller shared this information with Schmidt, Schmidt became concerned because the handling of personnel files is an extremely private matter, and Schmidt felt it was problematic for HR employees to discuss the contents with other employees without going through the proper protocol to attain that information (*Id.*, ¶ 17).

Schmidt contacted Haynie to share the concern that HR employees may be sharing private information (*Id.*). Having no reason to believe Schmidt was being dishonest, Haynie felt it was her duty to report this breach of protocol to Hicks, the Chief of HR (*Id.*, ¶ 18). Haynie suspected that Watson was the processing employee that Miller was referring to in her conversation with

---

[2] Miller's statement of material undisputed facts questions whether it was improper for Watson to disclose information in the file and suggests that there is no policy provided that demonstrates Watson's actions were improper (Dkt. No. 23-2, ¶¶ 8–9). Whether Watson's conduct was improper or whether Miller had a right to know what was in her personnel file is immaterial to Miller's claims of race or age discrimination.

Schmidt because Watson was the only individual, aside from a brief conversation with Hicks, with whom Haynie spoke about placing the June 2020 disciplinary in Miller's personnel file (*Id.*).

Hicks informed Haynie that he would reach out to Miller to ask her who disclosed that the June 2020 disciplinary was placed in her personnel file, as he shared Haynie's concerns that HR employees may be improperly disclosing private personnel information (*Id.*, ¶ 19).  On or around May 22, 2023, Hicks reached out to Miller for the first time through email, but Miller did not provide Hicks with the name of the individual in HR who disclosed to her that the June 2020 disciplinary was placed in her file (*Id.*, ¶ 20).  Hicks followed up on his first email and rephrased the question in the hopes of obtaining the name of the disclosing employee from Miller (*Id.*, ¶ 21). Hicks grew concerned that Miller was not disclosing the truth about the improper disclosure of confidential personnel information, and because of this concern, he felt that an in-person meeting with Haynie and Miller would provide a forum for Miller to disclose openly and honestly who shared the personnel information with her (*Id.*).

After assessing the evidence available to her, Haynie was convinced that Miller was being dishonest to Hicks because it was clear to her that Watson was the only individual who could have told Miller about the June 2020 disciplinary being added to her file, and Haynie communicated this to Hicks (*Id.*, ¶ 22).

On or around May 23, 2023, both Hicks and Haynie met with Miller and asked who disclosed the information to her, but Miller continued to deny for a third time that anyone did (*Id.*, ¶ 23).  Haynie expressed that she knew that an improper disclosure occurred, that both Hicks and Haynie simply wanted Miller to tell them the truth, and that she was not in trouble at that time, but Miller denied for a fourth time that the conversation between her and Watson had occurred (*Id.*, ¶ 24).  At that point, Schmidt was called into the meeting to detail the conversation she had with

Miller where Schmidt learned that someone in HR told Miller about the placement of the disciplinary in her file (*Id.*, ¶ 25). During this meeting, Schmidt was asked by Hicks and Haynie to explain how she found out that someone in HR was asked to place an old disciplinary in Miller's file (*Id.*). On or around May 25, 2023, Schmidt provided this same explanation in writing to Haynie by email (*Id.*). During the May 23, 2023, meeting, Schmidt explained that Miller came to her and told her that someone in HR had contacted her to tell her that Haynie hand-carried an old disciplinary to HR to be placed in Miller's personnel file (*Id.*, ¶ 26).

Miller denied that what Schmidt said was true and stated it did not happen (*Id.*, ¶ 27). Schmidt explained that she only knew about the disciplinary being added to her file because Miller told her directly (*Id.*). For a fifth time, Miller denied that an improper disclosure occurred and denied that the conversation with Schmidt ever happened (*Id.*).

Following the meeting, Hicks and Haynie felt that the next appropriate step would be to initiate a letter of investigation because they were still concerned about the improper disclosure, and they were faced with new concerns of Miller lying to them on multiple occasions (*Id.*, ¶ 28). On or around May 25, 2023, Haynie wrote a letter of investigation to Miller informing her that she was under investigation for violating DHS's requirement against deceptive behavior, which is found in DHS Policy 1084(II)(D) (*Id.*, ¶ 29). On or around that same day, Haynie and Shared Services HR Liaison George Bryant met with Miller to issue the letter of investigation, to which Miller was given until the end of the day to respond (*Id.*). In her response, Miller again denied for a sixth time that anyone told her about the disciplinary being placed in her personnel file (*Id.*, ¶ 30).

On or around May 26, 2023, Watson disclosed by email that she did in fact have a conversation with Miller in which Watson informed Miller that Haynie hand-carried the June 2020

6

disciplinary to Watson to place in Miller's personnel file (*Id.*, ¶ 32).  Haynie was not Watson's supervisor at that time, but she became aware that Watson, who is also an African American individual, was disciplined for the improper disclosure, but because she had been truthful, she was not terminated from her employment with DHS (*Id.*, ¶ 33).

When Schmidt originally informed Haynie of her conversation with Miller about the improper disclosure, it was not Haynie's intention to terminate Miller (*Id.*, ¶ 34).  Haynie felt she had no choice, however, but to move forward with termination because Miller was dishonest on numerous occasions where she was provided with the opportunity to be truthful (*Id.*).

On or about May 26, 2023, Bryant and Haynie called Miller and informed her that she was terminated for violating the DHS policy regarding honesty and integrity, that her access to the building would be cut off, that her personal belongings in her office would be inventoried and left at the front security desk for her to pick up the following Tuesday (since the following Monday was Memorial Day), and that she should bring her badge and keys to leave with security when she came to retrieve her belongings (*Id.*, ¶ 35).

Miller testified in her deposition that neither Haynie nor Hicks ever said anything to her that she perceived as unprofessional (*Id.*, ¶ 39; *see* Dkt. No. 16-1, 92:9–93:10).  Miller also testified that neither Haynie nor Hicks ever said or did anything toward Miller that she perceived as discriminatory on the basis of race or age (Dkt. No. 18, ¶ 39).  Miller also testified that no one employed by DHS ever said anything directly to her during the last five years of her employment that she perceived as racist or discriminatory on the basis of age (*Id.*).

Miller does not dispute that she violated DHS's policy on honesty and integrity (*Id.*, ¶ 40).

When asked to explain in her own words how she believes she was racially discriminated against, Miller testified that she felt that what happened to her would not have happened to a white

7

person, "that the level of discipline would not have been this level of discipline." *Id.*, ¶ 41. When asked whether she has any evidence to support her belief that racial discrimination or age discrimination was a motivation for her termination, Miller testified that she does not (*Id.*, ¶ 42).

On or about June 5, 2023, Miller admitted for the first time that she had been dishonest about the improper disclosure when she filed a grievance regarding her involuntary termination (*Id.*, ¶ 43). Miller did not tell the truth regarding the improper disclosure at any time before she was terminated on or around May 26, 2023, and she never disclosed the truth to Haynie directly (*Id.*, ¶ 44). Miller testified during her deposition that she has no desire to get her job back at DHS (*Id.*, ¶ 45).

When asked to identify any and all persons employed by DHS during the time of Miller's employment whom she alleges were situated similarly to her and received more favorable treatment by DHS than what she received, Miller identified only one person—Deborah Dees (*Id.*, ¶ 46). Deborah Dees was at one time employed by DHS (*Id.*, ¶ 47). Dees was never supervised by Haynie (*Id.*). Haynie never worked with Dees directly, was never responsible for disciplining Dees, and has no personal knowledge regarding any investigation that may have occurred prior to Dees ending her employment with DHS (*Id.*).

## II.    Summary Judgment Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56). Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the movant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The party requesting summary judgment is 'entitled to judgment as a matter of

law,' Fed. R. Civ. P. 56(c), if the non-movant fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Vaughn v. Wallace*, 496 F.3d 908, 910–11 (8th Cir. 2007) (internal quotations omitted).

"In ruling on a motion for summary judgment [t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial." *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir. 2004) (internal quotations omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

Parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

9

### III.     Race Discrimination Claims

#### A.     Race Discrimination Legal Standard

Under Title VII an employer may not discriminate against an employee with respect to compensation or the terms, conditions, or privileges of employment because of the employee's race. 42 U.S.C. § 2000e *et seq*. Likewise, under 42 U.S.C. § 1981, an employer cannot discriminate on the basis of race.

The legal standard for summary judgment on a race discrimination claim is the same as any other summary judgment motion. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) ("There is no 'discrimination case exception' to the application of summary judgment"). "To survive a motion for summary judgment on the race discrimination claim, [Miller] must either present admissible evidence directly indicating unlawful discrimination, or alternatively, [Miller] could create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas . . . .*" *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014); *see Collins v. Union Pacific Railroad Company*, 108 F.4th 1049, 1053 (8th Cir. 2024). The Court's framework at the outset is the same under § 1981 and Title VII. *Collins v. Union Pacific Railroad Co.*, 108 F.4th 1049, 1052–53 (8th Cir. 2024). [3]

"To prove intentional discrimination through direct proof, a plaintiff must establish a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the

---

[3] At the pretext stage, Title VII differs from § 1981. Under § 1981, "a plaintiff bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp. v. Nat. Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020). This standard is more rigorous than Title VII's "motivating factor" causation test. *Id.*, at 336–41. However, because the Court does not reach the pretext stage under *McDonnell Douglas*, this difference is not material.

employer's decision." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (internal quotations omitted).     Under *McDonnell Douglas*, "[t]o establish a *prima facie* case for race discrimination, '[Miller] must show (1) [s]he is a member of a protected class, (2) [s]he met h[er] employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently).'" *Young*, 754 F.3d at 577 (quoting *Gibson*, 670 F.3d at 853).  If any essential element of Miller's *prima facie* case is not supported by specific facts sufficient to raise a genuine issue for trial, summary judgment in favor of DHS is proper.  *See Grant v. City of Blytheville, Arkansas*, 841 F.3d 767, 773 (8th Cir. 2016) (explaining plaintiff must meet all elements of *prima facie* case under *McDonnell Douglas*).  The threshold of proof necessary to make a *prima facie* case is minimal. . . ."  *Johnson v. Arkansas State Police*, 10 F.3d 547, 551 (8th Cir. 1993).  "While '[t]he burden of establishing a prima facie case of disparate treatment is not onerous,' the plaintiff must be able to produce some evidence of similarity between her and her comparator."  *Rebouche v. Deere & Co.*, 786 F.3d 1083, 1087–88 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1047).

If Miller establishes the *prima facie* case for discrimination, then "the burden shifts to [DHS] to provide a nondiscriminatory reason for the discharge."  *Walker v. First Care Management Group, LLC*, 27 F.4th 600, 605 (8th Cir. 2022) (citing *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1125 (8th Cir. 2017)).  "If [DHS] meets its burden, [Miller] must demonstrate [DHS's] proffered nondiscriminatory reason was pretext for intentional discrimination."  *Walker*, 27 F.4th at 605.

### B.  Analysis

DHS argues that Miller fails to establish direct evidence of discrimination and fails to meet her burden under *McDonnell Douglas*, entitling DHS to judgment as a matter of law on Miller's Title VII claims (Dkt. No. 17, at 10).  Miller argues that she was discriminated against on the basis of her race because she was treated differently than a white employee was treated after an investigation (Dkt. No. 23-1, at 5).  Miller does not meaningfully engage with whether she met her employer's legitimate expectations (*Id.*).[4]  The Court finds, construing all record evidence and reasonable inferences from that evidence in favor of the nonmoving party, that Miller has not met her burden under *McDonnell Douglas* and that DHS is entitled to judgment as a matter of law.

Miller does not argue that there is direct evidence of discrimination.  It is uncontested that Miller provided no direct evidence of racial discrimination (Dkt. No. 18, ¶ 39).  Accordingly, *McDonnell Douglas* applies.

### 1.  *Prima Facie* Case

DHS concedes that Miller is a member of a protected class because she is African American (Dkt. No. 17, at 13).  DHS also concedes that Miller suffered an adverse employment action when she was terminated from her position at DHS (*Id.*, at 14).  The Court agrees that the first and third elements of the *prima facie* case under *McDonnell Douglas* are met.

However, the Court finds that DHS is entitled to summary judgment because Miller fails to provide specific facts sufficient to raise a genuine issue for trial on two essential elements of her *prima facie* claim.  First, Miller fails to provide specific facts sufficient to raise a genuine issue for

---

[4]  Miller argues that the Court should consider whether Miller "was qualified to perform the job" and does not mention her employer's legitimate expectation (Dkt. No. 23-1, at 3 (citing *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934)).  However, *Twymon*, does not support Miller's argument. *Twymon* never mentions qualifications.  Regardless, the test under *McDonnell Douglas* is whether Miller met DHS's legitimate employment expectations.

trial on whether Miller was meeting DHS's legitimate expectations.  Second Miller has failed to make a showing sufficient to establish that Dees was a sufficiently similarly situated employee to serve as a comparator at the *prima facie* case stage.

First, there is no genuine dispute of material fact as to whether Miller met her employer's legitimate expectation.  She did not.  It is undisputed that Miller was dishonest on six occasions prior to her termination.   It is also undisputed that Miller's behavior violated DHS's policy on honesty and integrity (Dkt. Nos. 16-10, at 2; 18, ¶ 29).  Miller does not contest DHS's argument that a pattern of dishonesty "fell well below the standard for someone occupying her position." (Dkt. No. 17, at 13).  Miller also does not contest that DHS expected Miller "to tell the truth."  *Id.* Based upon the undisputed factual record of dishonesty to her employer and DHS's articulated policy and expectation of honesty and integrity, the Court finds that Miller fails to meet her burden under *McDonnell Douglas* and that DHS is entitled to judgment as a matter of law.

Even if Miller had met her employer's legitimate expectations, on the limited record before it, the Court finds that Miller still would be unable to establish her *prima facie* case and DHS would still be entitled to summary judgment because there is no record evidence of circumstances giving rise to an inference of discrimination.  Miller contends that she was treated differently than Dees (Dkt. No. 23-1, at 4–5).  DHS argues that Miller is not similarly situated to Dees for Dees to serve as a comparator because Dees never worked with Haynie and was never disciplined by Haynie (Dkt. No. 17, at 15).  Miller argues that Dees is a sufficiently similarly situated comparator (Dkt. No. 23-1, at 5).  The Court finds that Miller does not meet her burden on the record evidence before the Court even at the *prima facie* case stage.

### 2.   Reasons For Termination

Assuming without deciding that Miller could establish a *prima facie* case, DHS sufficiently proffers a nondiscriminatory reason, dishonesty, as the reason for Miller's termination. Therefore, the burden shifts to Miller to establish pretext.

### 3.   Pretext

Even if Miller had met her *prima facie* burden, Miller has presented no record evidence to create a genuine dispute of material fact as to whether DHS's proffered nondiscriminatory reason, dishonesty, was pretext for intentional discrimination based on race.

To satisfy the *prima facie* requirement of demonstrating circumstances that give rise to an inference of racial discrimination by reference to similarly situated persons who were treated more favorably than she was treated, Miller "must show the employees were 'similarly situated in all relevant respects.'" *Young*, 754 F.3d at 578 (quoting *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012)). The pretext analysis applies a "rigorous" review of the similarly situated individuals. *Nelson v. Lake Elmo Bank*, 75 F.4th 932, 939 (8th Cir. 2023). However, the comparator need not be a "clone." *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013). Some factors to consider include whether the comparator dealt with the same supervisors, was subject to the same standards, or engaged in the same conduct without any mitigating or distinguishing circumstances. *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir. 2003). Miller must establish a sufficient factual showing of similarity. *Vaughn*, 496 F.3d at 910–11.

Miller does not make a sufficient showing to establish that Dees is similarly situated for the pretext analysis. Miller's statement of material undisputed facts does not provide a sufficient basis for the Court to find that there is a dispute of material fact as to whether Dees is substantially

14

similar to Miller (Dkt. No. 23-2. ¶ 12).  Under Local Rule 56.1 and Federal Rule of Civil Procedure Rule 56(c), Miller must provide record citations for all factual statements.

On the record before the Court, Miller has provided the Court with few facts and no record citations for the statements she makes about Dees.  The Court has no record evidence regarding Dee's employment history, including discipline and investigations.  The extent of Miller's record evidence as to Dees is what Hicks's affidavit does not say (Dkt. No. 23-2, ¶ 13).  On the other hand, there is undisputed record before the Court that establishes that Haynie did not supervise Dees, did not discipline Dees, and made no determinations regarding an investigation into Dees.  Further, there is undisputed record evidence that Haynie supervised Miller starting in July 2020 until Miller's termination and that Haynie made the decision to terminate Miller (Dkt. No. 18, ¶¶ 5, 34–35).  On the limited record before the Court, Miller has failed to meet her burden to show that Dees is similarly situated in all relevant respects, while at the same time, DHS has pointed to a substantial dissimilarity between the two employees.  The Court accordingly finds that no reasonable factfinder could find that Miller and Dees are similarly situated in all relevant respects to establish pretext.

For all of these reasons, DHS is entitled to judgment as a matter of law on Miller's race discrimination claim.

## IV.    ADEA Discrimination

DHS argues that it is entitled to sovereign immunity under the Eleventh Amendment (Dkt. No. 17, at 18).  Miller argues that Eleventh Amendment sovereign immunity is overcome because "Defendant has acted unconstitutionally by acting in bad faith, arbitrarily, capriciously, and in a wantonly injurious manner in terminating [Miller] . . . ."  (Dkt. No. 23-1, at 6).  The Court agrees with DHS that Miller's claims are barred by sovereign immunity.

"The Eleventh Amendment immunizes an unconsenting State from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular federal cause of action." *Becker v. University of Nebraska at Omaha*, 191 F.3d 904, 908. The Eleventh Amendment applies when the state is named as a defendant and in certain actions against state instrumentalities. *Regents of University of California v. Doe*, 519 U.S. 425, 429–30 (1997). "A state agency or official may invoke the State's Eleventh Amendment immunity if immunity will protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself." *Becker*, 191 F.3d at 908 (internal quotations omitted).

The Supreme Court has ruled that the ADEA contained an unconstitutional abrogation of state sovereign immunity and has determined that abrogation invalid. *Kimel v. Florida Board of Regents*, 528 U.S. 62, 78 (2000). Thus, any relief for money damages under the ADEA is barred by the Eleventh Amendment. To the extent that Miller seeks monetary relief under the ADEA, her claim is barred by the Eleventh Amendment.[5]

Second, it is unclear whether Miller seeks injunctive relief on her ADEA claim, which is sometimes permitted under the Eleventh Amendment. *Compare* Dkt. No. 1, ¶ 17(b) (seeking reinstatement) *with* Dkt. No. 18, ¶ 45 (stating Miller has no desire to get her job back). However, regardless of whether Miller presently seeks injunctive relief, DHS is entitled to judgment as a matter of law on sovereign immunity grounds.

---

[5] Miller's citations to *Kelley v. Johnson*, 496 S.W.3d 346, 354 (Ark. 2019), and *Arkansas State Police Retirement System v. Sligh*, 516 S.W.3d 241, 246 (Ark. 2017), are inapposite. Neither Arkansas Supreme Court decision grapples with the Eleventh Amendment or Congress's purported—but unconstitutional—abrogation of sovereign immunity in the ADEA.

"[U]nder the doctrine set forth in *Ex Parte Young,* 209 U.S. 123, [] (1908), state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment[; however], the same doctrine does not extend to states or state agencies." *Monroe v. Arkansas State University*, 495 F.3d 591, 594 (8th Cir. 2007). Here, Miller names as a defendant only DHS, an agency of the state of Arkansas. Because an agency does not fall under the *Ex parte Young* framework, the State's Eleventh Amendment sovereign immunity applies. Miller's ADEA claim for injunctive relief, to the extent she seeks it, is barred.

The Court finds that DHS is entitled to sovereign immunity under the Eleventh Amendment on all of Miller's ADEA claims.

### V.       Fourteenth Amendment Claim

Miller also brings a claim for violations of the Fourteenth Amendment under 42 U.S.C. § 1983 (Dkt. No. 1, ¶ 13). In DHS's answer to the complaint, DHS asserts that Millers claims are barred by sovereign immunity (Dkt. No. 11, ¶ 28). The Court finds that Miller's Fourteenth Amendment claims are also barred by sovereign immunity.

"The Eleventh Amendment immunizes an unconsenting State from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular federal cause of action." *Becker*, 191 F.3d at 908. The Eleventh Amendment applies when the state is named as a defendant and in certain actions against state instrumentalities. *Regents of University of California*, 519 U.S. at429–30. "A state agency or official may invoke the State's Eleventh Amendment immunity if immunity will protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself." *Becker*, 191 F.3d at 908 (internal quotations omitted).

17

First, to the extent that Miller seeks monetary relief under § 1983, that claim is barred by sovereign immunity. The State of Arkansas has not consented to be sued in the federal courts, so Miller's § 1983 claim for money damages can only proceed if Congress properly abrogated state sovereign immunity (*see* Dkt. No. 11, ¶ 28). However, "Congress did not abrogate the states' sovereign immunity when it enacted 42 U.S.C. § 1983." *Smith v. Beebe*, 123 Fed.Appx. 261, 262 (8th Cir. 2005); *see Roe v. Nebraska*, 861 F.3d 785, 789 (8th Cir. 2017); *Burk v. Beene*, 948 F.2d 489, 492–93 (8th Cir. 1991). Accordingly, Miller's money damages § 1983 claim is barred.

Second, it is unclear whether Miller seeks injunctive relief on her Fourteenth Amendment claim, which is sometimes permitted under the Eleventh Amendment. *Compare* Dkt. No. 1, ¶ 17(b) (seeking reinstatement) *with* Dkt. No. 18, ¶ 45 (stating Miller has no desire to get her job back). However, regardless of whether Miller presently seeks injunctive relief, DHS is entitled to judgment as a matter of law on sovereign immunity grounds.

"[U]nder the doctrine set forth in *Ex Parte Young,* 209 U.S. 123, [] (1908), state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment[; however], the same doctrine does not extend to states or state agencies." *Monroe*, 495 F.3d at 594. Here, Miller names as a defendant only DHS, an agency of the state of Arkansas. Because an agency does not fall under the *Ex parte Young* framework, the State's Eleventh Amendment sovereign immunity applies. Miller's § 1983 claim for injunctive relief, to the extent she seeks it, is barred.

## VI.    Conclusion

For the foregoing reasons, the Court grants DHS's motion for summary judgment (Dkt. No. 16). The Court dismisses with prejudice Miller's Title VII and § 1981 race discrimination

claims, her Fourteenth Amendment § 1983 claim, and her ADEA age discrimination claims. There are no claims left to be tried.

It is ordered this 31st day of March, 2026.

_____
Kristine G. Baker
Chief United States District Judge